UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br><br> vs.<br><br>FRANK GALLARDO,<br><br>     Defendant. | CR. 15-50061-JLV<br><br><br>ORDER |

## INTRODUCTION

On August 31, 2016, following a two-day jury trial, Defendant Frank
Gallardo was found guilty of two counts of abusive sexual contact. (Docket
106). On December 29, 2017, Mr. Gallardo filed a motion for judgment of
acquittal or, in the alternative, a motion for new trial. (Docket 158). The
government moves to strike defendant's motions as untimely because the
motions were not based on newly discovered evidence. (Docket 161). On
February 2, 2018, Mr. Gallardo filed an amended motion for judgment of
acquittal or, in the alternative, for a new trial. (Docket 177). The government
filed a brief in resistance to defendant's amended motions. (Docket 187). Mr.
Gallardo filed a reply brief in support of his motions. (Dockets 188). For the
reasons stated below, defendant's amended motion for judgment of acquittal is
denied and his amended motion for new trial is denied in part and reserved in
part.

**ANALYSIS**

MOTION FOR JUDGMENT OF ACQUITTAL

The jury returned its guilty verdicts and was discharged on August 31, 2016. (Dockets 102 at p. 7 & 106). Mr. Gallardo's motion for judgment of acquittal pursuant to Fed. R. Crim. P. 29(c)(1) was filed on December 29, 2017. (Docket 158). The government moved to strike defendant's motion as untimely. (Docket 161 at pp. 1-2). Mr. Gallardo filed an amended motion renewing the motion for judgment of acquittal and for a new trial. (Docket 177). The government resisted the amended motion for, among other reasons, timeliness. (Docket 187 at pp. 1-3).

Rule 29 provides "[a] defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." Fed. R. Crim. P. 29(c)(1). Carlisle v. United States, 517 U.S. 416 (1996), declared in no uncertain terms that "a motion for judgment of acquittal must be filed, either within [14] days of the jury's discharge, or within an extended period fixed by the court during that [14]–day period."[1] Id. at 421.

Mr. Gallardo contends the time limitation set forth in Rule 29 "does not appear to bar the court from reconsideration of its previous denial [pursuant to

---

[1]Carlisle was decided before the 2009 amendment to Fed. R. Crim. P. 29 extended the time period of Rule 29(c)(1) to 14 days. See Advisory Committee Notes to Fed. R. Crim. P. 29, 2009 Amendments.

Rule 29(a)] at trial." (Docket 178 at p. 2). He argues "[t]o the extent that the grounds for the motion for acquittal pertains to the subject matter of a previously considered motion, the court has authority to reconsider based on the trial transcript and other argument or evidence not previously made or provided." Id. (referencing Fed. R. Civ. P. 15(c)(1)(B) and <u>Davenport v. United States</u>, 217 F.3d 1341, 1344 (11th Cir. 2000)).

In the alternative, Mr. Gallardo submits the court may on its own or for good cause upon a showing of excusable neglect, by the application of Fed. R. Civ. P. 45(b), extend the time limit of Rule 29(c)(1). Id. Mr. Gallardo argues his attorney has bought "to light certain facts and circumstances establishing good cause and excusable neglect" warranting application of Rule 45. Id.

Rule 45(b) provides "[w]hen an act must or may be done within a specified period, the court on its own may extend the time, or for good cause may do so on a party's motion made: (A) before the originally prescribed or previously extended time expires; or (B) after the time expires if the party failed to act because of excusable neglect." Fed. R. Crim. P. 45(b)(A) & (B). "The 'excusable neglect' standard contained in Rule 45 applies to the time period limitation in both Rule 29 and Rule 33 and allows a court to extend the time period for filing such motions if the party's failure meets that standard." <u>United States v. Thunder</u>, No. CR 11-30113, 2013 WL 774199, at *1 (D.S.D. Feb. 28, 2013), *aff'd*, 745 F.3d 870 (8th Cir. 2014) (referencing <u>United States v. Boesen</u>, 599 F.3d 874, 879 (8th Cir. 2010)). The Supreme Court established

3

four factors which must be considered when determining whether a failure to timely file a motion results from excusable neglect. <u>Boesen</u>, 599 F.3d at 879 (citing <u>Pioneer Investment Services Co. v. Brunswick Associates Ltd. Partnership</u>, 507 U.S. 380, 395 (1993)). Those factors are: "(1) the danger of prejudice to the opposing party, (2) the length of delay and its potential impact on judicial proceedings, (3) the reason for the delay, including whether it was within the reasonable control of the movant, and (4) whether the movant acted in good faith." <u>Id.</u> (internal citation and brackets omitted). A district court's excusable neglect determination is reviewed for an abuse of discretion. <u>Id.</u> (referencing <u>United States v. Gary</u>, 341 F.3d 829, 836 (8th Cir. 2003)).

As to the first factor, the court finds there would be no prejudice to the government if Mr. Gallardo's motion for a judgment of acquittal were granted as it is the obligation of the government at all times to do justice. The second factor, the length of the delay, cuts against granting a judgment of acquittal as nearly 16 months transpired between the jury's verdict and Mr. Gallardo's motion. He offers no excuse for the late filing. As to the third factor, the reason for the delay, Mr. Gallardo provides no explanation and the court can find no justification for the delay in the record. As to the fourth factor, the court finds Mr. Gallardo has not acted in good faith. While Mr. Gallardo secured a change of counsel, in fact two changes of counsel, in the months after the jury verdict, both his trial counsel and the first attorney appointed to represent him were competent and knowledgeable regarding the Federal Rules

of Criminal Procedure.   Yet for over 14 months, trial counsel and the first post-trial counsel did not file a Rule 29(c)(1) motion.   Rather, Mr. Gallardo and his previous attorneys spent their time preparing for sentencing.   <u>See</u> Dockets 107-49.   Mr. Gallardo's current attorney does not provide any explanation for this extensive delay in filing.

The court finds the <u>Boesen</u> factors weigh against a finding of excusable neglect.   The Rule 29(c)(1) motion is denied as untimely.   Even were the court to find the motion was timely filed, the motion for judgment of acquittal must be denied.

Fed. R. Crim. P. 29(c) gives the district court authority to set aside a guilty verdict and enter an acquittal upon a defendant's post-trial motion.   "A district court has very limited latitude in ruling upon a motion for judgment of acquittal."   <u>United States v. Baker</u>, 367 F.3d 790, 797 (8th Cir. 2004) (citation and internal quotation marks omitted).   "A motion for judgment of acquittal should be granted only if there is no interpretation of the evidence that would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt."   <u>United States v. Boesen</u>, 491 F.3d 852, 855 (8th Cir. 2007) (citations and internal quotation marks omitted).   This standard is very strict and the court should not overturn a jury verdict lightly.   <u>Id.</u>

The district court must enter an acquittal if the evidence presented at trial is insufficient to sustain a conviction.   <u>Id.</u>   Evidence may be direct or circumstantial.   <u>Baker</u>, 367 F.3d at 798.   "Evidence supporting a conviction is

5

sufficient if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Boesen, 491 F.3d at 856 (citation and internal quotation marks omitted). The district court must not weigh the evidence or assess the credibility of witnesses. Baker, 367 F.3d at 797; see also Boesen, 491 F.3d at 857 ("In ruling on a motion for a judgment of acquittal, the role of the court is not to weigh the evidence . . . but rather to determine whether the Government has presented evidence on each element to support a jury verdict.") (citations and internal quotation marks omitted) (ellipses in original).

The district court "views the entire record in the light most favorable to the government, resolves all evidentiary conflicts accordingly, and accepts all reasonable inferences supporting the jury's verdict." Boesen, 491 F.3d at 856. In short, the court upholds the jury verdict if "drawing all reasonable inferences in favor of the verdict, there is an interpretation of the evidence that would allow a reasonable minded jury to find the defendant[] guilty beyond a reasonable doubt." Id. (citations and internal quotation marks omitted; alteration in original). "Importantly, it is not necessary for the evidence before the jury to rule out every reasonable hypothesis of innocence. It is enough if the entire body of evidence be sufficient to convince the fact-finder beyond a reasonable doubt of the defendant's guilt." United States v. Wright, 739 F.3d 1160, 1167 (8th Cir. 2014) (internal citation, quotation marks and brackets omitted).

<u>THE TRIAL EVIDENCE</u>

Accepting the directive of <u>Boesen</u>, 491 F.3d at 856, and viewing the evidence "in the light most favorable to the government . . . and accept[ing] all reasonable inferences supporting the jury's verdict," the following evidence was presented at trial. A.B., the 10-year-old victim of Mr. Gallardo's conduct, testified at trial. (Docket 164 at pp. 27-47). She testified she knew the difference between telling the truth and a lie. <u>Id.</u> at p. 30:6-10. She told the jury Frank Gallardo was part of her family because he was with her mother, Suzette Thunder Hawk. <u>Id.</u> at pp. 30:15-31:2. A.B. pointed out Frank in the courtroom. <u>Id.</u> at p. 32:5-9. She said she had a good relationship with him and they did fun things together. <u>Id.</u> at p. 31:3-6.

A.B. testified she and her family were living at the Sager's ranch near Porcupine, South Dakota, where cattle were raised. <u>Id.</u> at p. 31:12-32:32:1. She told the jury that she helped Frank on a tractor feed the livestock. <u>Id.</u> at p. 32:10-18. She described the tractor as a big green tractor with a cab on it. <u>Id.</u> at pp. 32:19-33:1. When she was alone with Frank in the tractor he would sit on the seat and she would sit next to him on a "handle bar kind of like a seat." <u>Id.</u> at p. 33:2-17. At some point in time, Frank told her she could drive the tractor. <u>Id.</u> at pp. 33:18-34:5. To drive the tractor, Frank told her to sit on his lap as it would make it easier for her to drive. <u>Id.</u> at p. 34:8-11. A.B. ended up sitting on Frank's lap so she could drive the tractor. <u>Id.</u> at p. 34:10-11.

A.B. told the jury she knew that a boy had a penis and that while she was driving the tractor Frank's "private" touched her private on the outside of her clothing.   Id. at p. 36:4-12 & 15-18.   Because of that touching she felt she "couldn't be by him anymore."   Id. at p. 36:13-14.   While A.B. was too embarrassed to tell the jury what Frank did exactly, she explained what happened to Brandi Tonkel.   Id. at p. 35:19-25.

Regarding the second count of abusive sexual contact, A.B. told the jury that the incident occurred in the house at the Segar ranch while she was on the couch watching television with her mother and Frank.   Id. at pp. 36:19-23 & 37:3-4.   While her mother was gone to the restroom, A.B. testified Frank touched her private part with his hand.   Id. at p. 37:8-18.   He stopped touching A.B. when her mother came out of the bathroom.   Id. at p. 37:19-21.   A.B. told her mother about what happened as the two of them sat on the couch.   Id. at p. 38:3-9.   After A.B. told her mother, FBI Special Agent Bennett got involved.   Id. at p. 38:13-15.

During cross-examination, A.B. told the jury that the tractor incident occurred when she and Frank were feeding calves during daylight hours.   Id. at p. 41:13-15.   She remembers they were out in the field making hay bales.   Id. at pp. 42:25-43:1.   She testified that Frank picked her up and set her on his lap.   Id. at p. 42:8.

Concerning the incident on the couch, A.B. testified the three of them were playing around while watching television.   Id. at p. 44:7-14.   They "were

telling jokes; just having fun." Id. at p. 44:18. When Frank touched her private part, A.B. told Frank to stop. Id. at p. 45:11-12. A.B. clarified that it was after Frank left the house that A.B. told her mother what he had done. Id. at p. 47:1-5.

After A.B. testified, the parties stipulated and disclosed to the jury that A.B. and two of her female cousins had been sexually abused by her cousin, Jaron Thunder Hawk, in 2013. Id. at p. 49:4-7. The stipulation acknowledged that A.B. reported the sexual abuse to law enforcement, Jaron was prosecuted and he pled guilty to the offense involving A.B. Id. at p. 49:7-10.

The written stipulation, which was read to the jury, contained the following detailed information:

> AB was forensically interviewed on July 31, 2013, by Brandi Tonkel from the Child Advocacy Center of the Black Hills at the time she was 7 years old. The following is information and quotes from the interview, but do not encompass the entirety of the interview.
>
> • A.B. stated she knew the difference between the truth and a lie.
>
> • She identified her "private" which was depicted on a drawing as her labia/vagina, and her "butt."
>
> • A.B. identified Jaron as the person who touched her and made her feel "gross" and "icky"' and that he did the same things to two of her female cousins.
>
> • When invited to indicate on the diagram where Jaron touched her body, A.B. pointed to the "private," "butt," and mouth. When asked what Jaron used to touch her "private," A.B. pointed to the hand on the diagram. When asked what part of Jaron's hand he used to touch her "private," A.B. pointed to the fingers. When invited to

demonstrate what Jaron's fingers do when he touches her "private," A.B. held up her hand in the air and wiggled her index finger back and forth/A.B. pointed her index finger in the air and made a scooping movement upwards.   When asked where her clothes were when Jaron touched her "private" with his finger, A.B. said, "On."

• The interviewer asked if Jaron's finger stayed on the outside of her clothes, or if Jaron's finger goes someplace else, A.B. paused for a moment, and then said, "Inside."   The interviewer asked if A.B. was wearing something underneath her clothes, such as underwear or panties, when Jaron touched her and A.B. confirmed she was wearing panties.

• She stated he touched her both "inside and outside" her panties and demonstrated that his finger went back and forth and in and out of her panties on her "private."   She later stated that his fingers were "outside" but when the interviewer stated she was confused about whether his fingers went both inside and outside of her panties, A.B. nodded her head.   This incident of touching occurred in A.B.'s Grandmother's bathroom, no one else was present and Jaron shut the door.

• Jaron tried to keep her "mouth shut" by placing his hand over her mouth and told her to "be quiet" in the bathroom while he touched her "private."

• A.B. stated Jaron "grabbed" her "butt" with "his hand" on the "outside" of her clothes.

• A.B. stated Jaron "kissed" her on the "mouth" and it made her feel "really ugly."

• A.B. stated that Jaron touched her "private" and "butt" with his "private" while they were outside the house by pulling her "butt by his private" and putting her "up to his private" while he was sitting down on a chair.   She indicated Jaron touched her in that way "lots" and always with his clothes on. She indicated Jaron's "private" was "hanging up" rather than hanging down, like the boy in the anatomical picture she was shown with the boy's penis hanging down.   She indicated she knew his "private" was "hanging up" because she "felt it on" her "butt."

• A.B. stated that after Jaron touched her private it "felt like someone just grabbed it and squeezed it."

• When asked if anyone else touched her A.B. indicated that she was sexually abused by another minor at times in the past. The case was not investigated and the minor was not charged. The minor is not the defendant, Frank Gallardo.

See Dockets 93 and 164 at pp. 49:11-52:10.

A.B.'s mother Suzette Thunder Hawk testified at trial. Id. at pp. 52-84. She identified herself as Frank's wife. Id. at p. 52:25-53:2. She considered his relationship with A.B. as a "father-daughter relationship." Id. at p. 54:20-22. Ms. Thunder Hawk testified that at some point in time the three of them moved out to the Sager ranch where Frank was a ranch hand who did mechanic work and helped with the cows. Id. at p. 55:10-16. She testified Frank would typically feed the cattle in the early morning and in the evening, while it was still daylight. Id. at p. 56:14-20. He would use the tractor to go get hay bales and feed them to the cows. Id. at p. 57:1-2.

Ms. Thunder Hawk identified the green tractor in Trial Exhibit 5 as the tractor used to feed the cows. Id. at p. 57:4-11. She testified she was aware of only four or five times when A.B. was alone with Frank in the tractor. Id. at p. 59:7-14.

Ms. Thunder Hawk testified that A.B., Frank and she would sit together on a couch in the ranch house. Id. at p. 64:2-10. After Ms. Thunder Hawk returned from the bathroom, A.B. told her what Frank had done to her. Id. at p. 65:22-25. A.B. and Ms. Thunder Hawk immediately left the ranch and

11

returned to her parents' home.   Id. at pp. 67:22-68:3.   Ms. Thunder Hawk

called the FBI and reported what A.B. told her.   Id. at p. 68:8-11.   A.B. was

later seen by a forensic interviewer.   Id. at p. 68:15-17.

After leaving the ranch, Ms. Thunder Hawk says she was contacted by

Frank.   Id. at pp. 68:21-23.   She testified he was trying to get her to say A.B.

was lying and just trying to ruin their relationship.   Id. at p. 69:1-3.   She said

Frank asked her to talk A.B. out of telling what happened between them and

asked that A.B. change her story.   Id. at p. 69:6-14.

Ms. Thunder Hawk told the jury this was the second time A.B. had been

sexually abused.   Id. at p. 70:3-9.   That abuse occurred in 2013 and the

perpetrator, Ms. Thunder Hawk's nephew, pled guilty.   Id. at pp. 70:6-9 and

70:24-71:1.

During cross-examination, Ms. Thunder Hawk described her relationship

with Frank as "rocky."   Id. at p. 72:1-3.   She acknowledged the date upon

which she called the FBI about Frank's conduct was March 17, 2015.   Id. at

p. 73:4-8.

FBI Special Agent Bob Bennett testified at trial.   Id. at pp. 84-101 and

114-18.   SA Bennett received the call from Ms. Thunder Hawk regarding the

allegations made against Frank Gallardo by A.B.   Id. at p. 85:3-8.   The call

came in on either March 16 or 17.   Id. at p. 85:7.   Ms. Thunder Hawk

appeared to be excited and agitated with a stressed voice.   Id. at p. 85:10-13.

SA Bennett testified "there was never any indication of a false report, false

statement, either by the victim . . . or the mother . . . ." Id. at p. 89:4-6.

Because of the young age of A.B., SA Bennett did not conduct an interview, but rather she was interviewed by a "specialized forensic interviewer." Id. at p. 93:12-14.

During cross-examination, SA Bennett testified that he understood one of the FBI victim specialists took a call from Ms. Thunder Hawk approximately two weeks after the disclosure was made in which she recanted the sexual abuse accusation. Id. at p. 94:10-17. SA Bennett acknowledged he subsequently made a report on November 20, 2015, which documented that Ms. Thunder Hawk wanted the investigation to end because she wanted to get back together with Frank Gallardo. Id. at p. 97:1-20.

Brandi Tonkel, the lead forensic interviewer at the Child Advocacy Center in Rapid City, South Dakota testified at trial.[2] Id. at pp. 119-44 and 173-216. She explained the purpose of a forensic interview involving an alleged child victim. Id. at p. 126:1-19. Ms. Tonkel interviewed A.B. on March 19, 2015, when she was eight years, nine months old.[3] Id. at pp. 142:18-22 & 176:19-21. A.B. described for Ms. Tonkel about being touched in the wrong places by

---

[2]Prior to trial, the defendant was given notice of the government's intent to call Ms. Tonkel as an expert witness at trial. See Docket 80.

[3]The court overruled a defense objection and permitted Ms. Tonkel to testify about the content of her interview of A.B. under Fed. R. Evid. 807 and United States v. Peneaux, 432 F.3d 882 (8th Cir. 2005). (Docket 164 at pp. 144:13-146:21).

Frank: once in the tractor and the other on the couch.  Id. at p. 177:9-24.

A.B. drew two diagrams clarifying the two separate events.  Id. at p. 178:18-22; see also Trial Exhibits 2A and 2B.

In describing the tractor incident, A.B. told Ms. Tonkel that once A.B. was on Frank's lap he put his "middle on her behind."  (Docket 164 at p. 182:13-14).  A.B. described the event as "[u]ncomfortable and I didn't like it."  Id. at p. 182:20-24.

Describing to Ms. Tonkel the incident on the couch, A.B. said Frank touched her middle with his hands.[4]  Id. at p. 184:5-7.  Ms. Tonkel understood A.B. to be describing her "vaginal/labia area" based on her earlier anatomical drawing.  Id. at p. 184:8-13.  During cross-examination, Ms. Tonkel was asked what caused the touching incident on the couch to stop and she reported that A.B. said "[w]hen I got up."  Id. at p. 199:9-10.

Ms. Patty Yellow Boy, a realty officer with the Bureau of Indian Affairs, testified that the Sager ranch was within the exterior boundaries of the Pine

---

[4]The transcript says Frank touched her "with his pants."  (Docket 164 at p. 184:6-7).  The court finds "pants" is a typographical error by the court reporter which is corrected by this order to "hands."  Fed. R. Crim. P. 36 ("After giving any notice it considers appropriate, the court may at any time correct a clerical error in a judgment, order, or other part of the record, or correct an error in the record arising from oversight or omission.").  The court does not believe notice to the parties is necessary as neither of them claimed nor argued that Mr. Gallardo touched A.B. "with his pants" while on the couch. All of the testimony and argument of counsel focused upon his use of his hands to touch A.B. inappropriately.  See Dockets 164 at pp. 24:7-8; 37:16-20; 165 at p. 53:14-15; 54:18-19.

Ridge Indian Reservation.   (Docket 165 at pp. 5:24-6:3).   Ms. Kacina One Horn, an enrollment clerk for the Oglala Sioux Tribe testified that A.B. has a Native American blood quantum of 19/32 and she is an enrolled member of the Oglala Sioux Tribe.   Id. at pp. 7:2-10:7; see also Trial Exhibit 3.

In his defense, Mr. Gallardo called witnesses to refute the evidence presented by the government.   Vanessa Swallow testified she had a conversation in March 2015 with Ms. Thunder Hawk wherein she said she intended to make up lies about Frank hurting her daughter.   (Docket 165 at p. 16:10-17).   Ms. Swallow indicated Ms. Thunder Hawk was frustrated because Frank "was working too much and she wanted his attention."   Id. at pp. 16:24-17:4.   Ms. Swallow testified she admonished Ms. Thunder Hawk that she could "get in a lot of trouble for lying."   Id. at p. 16:17-18.   In a second conversation, Ms. Swallow testified Ms. Thunder Hawk "wanted to recant her statement against Frank because she . . . made a mistake."   Id. at p. 16:19-23.   Ms. Swallow testified during cross-examination that she never reported these conversations to the United States Attorney's Office, the FBI or the Oglala Sioux Tribe.   Id. at p. 17:14-20.

Lauren Craft, a substance abuse counselor for the Pennington County Sheriff's Office in the City County Alcohol and Drug Program, testified.   Id. at pp. 18:16-19:11.   She knew Ms. Thunder Hawk and Frank Gallardo because he worked for her boyfriend on the ranch.   Id. 19:12-17.   Ms. Craft described Ms. Thunder Hawk as a "very jealous person," "almost violent" and "very

belligerent." <u>Id.</u> at pp. 19:23-20:15.   Ms. Craft testified Ms. Thunder Hawk and Frank "fought a lot" and "[d]idn't seem very happy together." <u>Id.</u> at p. 19:22-23.   Ms. Craft described two situations in which she felt Ms. Thunder Hawk acted inappropriately. <u>Id.</u> at pp. 20:2-21:12.   During cross-examination, Ms. Craft acknowledged her boyfriend, Jeremy Glasgow, was living on the ranch together with Shelley [Neprud] Glasgow, who was in a relationship with him and with whom he had two children. <u>Id.</u> at p. 23:7-21.

Barbara Neiswander of Livermont, Colorado, testified as a defense witness. <u>Id.</u> at pp. 25:8-31:21.   She told the jury she hired Frank Gallardo in March 2015 to do repairs at her home and used his services for the previous three to four years. <u>Id.</u> at p. 26:8-17.   She testified that several times Frank spoke with Ms. Thunder Hawk by cellphone during March, describing their conversations as 10-20 times a day. <u>Id.</u> at pp. 26:19-27:18.   One time she remembers Frank showing her a text message from Ms. Thunder Hawk in which she said she had called the FBI and accused him. <u>Id.</u> at p. 28:3-6.

Ms. Neiswander said a few days later Ms. Thunder Hawk called saying she wanted Frank back and was sorry that she had lied, but had wanted him in prison. <u>Id.</u> at p. 28:11-18.   Ms. Neiswander specifically recalled Ms. Thunder Hawk saying "I am going to call the FBI and I am going to tell them I lied." <u>Id.</u> at p. 28:23-24.   Later, Ms. Neiswander said Ms. Thunder Hawk called Frank and said "I called the FBI and everything has been cancelled.   I

told them it wasn't true, I made it up because I was really angry." Id. at p. 28:25-29:2.

In rebuttal, the government called Ms. Daniele Dosch, a victim specialist with the FBI. Id. at p. 34:13-14. She recalled a telephone conversation with Ms. Thunder Hawk about one week after the allegations against Mr. Gallardo were made. Id. at p. 38:17-19. During the call, Ms. Thunder Hawk was "upset" and "devastated" because she said "[h]er whole life had been turned upside down in a tailspin" and "[s]he was very concerned about housing, food, clothing, providing just for the basic necessities of her family." Id. at pp. 35:25-36:7. At no time did Ms. Thunder Hawk indicate that either she or A.B. lied about the allegations against Mr. Gallardo. Id. at p. 37:10-15.

The district court must not weigh the evidence or assess the credibility of witnesses. Baker, 367 F.3d at 797; see also Boesen, 491 F.3d at 857. Based on the trial record, the court finds a "rational trier of fact could have found the essential elements of the crime[s] beyond a reasonable doubt." Boesen, 491 F.3d at 856 (internal quotation marks omitted); see Docket 95 at pp. 5-8 (listing the essential elements). Put another way, the court finds the record fails to establish that "there is no interpretation of the evidence that would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt." Id. at 855 (internal quotation marks omitted). The court comes to this conclusion after "drawing all reasonable inferences in favor of the

verdict[.]" <u>Id.</u> at 856 (internal quotation marks omitted).   Defendant's motion

for judgment of acquittal is denied.

<u>MOTION FOR NEW TRIAL</u>

As indicated above, the jury returned guilty verdicts and was discharged

on August 31, 2016.   (Dockets 102 at p. 7 & 106).   Mr. Gallardo's motion for

new trial pursuant to Fed. R. Crim. P. 33 was filed on December 29, 2017.

(Docket 158).   The government moved to dismiss defendant's motion for new

trial as untimely.   (Docket 161 at pp. 1-2).   Mr. Gallardo filed an amended

motion renewing the motion for a new trial.   (Docket 177).   The government

resisted the amended motion for, among other reasons, timeliness.   (Docket

187 at pp. 1-3).

Rule 33 provides that "[u]pon the defendant's motion, the court may

vacate any judgment and grant a new trial if the interest of justice so requires."

Fed. R. Crim. P. 33(a).   The time constraints for filing a Rule 33(a) motion are:

"[a]ny motion for a new trial grounded on newly discovered evidence must be

filed within 3 years after the verdict or finding of guilty. . . . Any motion for a

new trial grounded on any reason other than newly discovered evidence must

be filed within 14 days after the verdict or finding of guilty."   Fed. R. Crim. P.

33(b)(1) & (2).

Mr. Gallardo contends his "motion for new trial is one based not only on

the record but also on the grounds of newly discovered evidence."   (Docket

178 at p. 1).   He argues that notwithstanding the limits of Rule 33, "the court

retains authority to reconsider any previously denied motion based on the trial transcript or other argument or evidence not previously made or provided." Id. at p. 2 (referencing Davenport, 217 F.3d 1341, and Fed. R. Civ. P. 15). Mr. Gallardo submits the court may on its own or for good cause upon a showing of excusable neglect, by the application of Rule 45(b), extend the time limit of Rule 33. Id. In support of this argument, Mr. Gallardo argues he has brought "to light certain facts and circumstances establishing good cause and excusable neglect" warranting application of Rule 45. Id.

"The 'excusable neglect' standard contained in Rule 45 applies to the time period limitation in . . . Rule 33 and allows a court to extend the time period for filing such motion[] if the party's failure meets that standard." Thunder, No. CR 11-30113, 2013 WL 774199, at *1 (referencing Boesen, 599 F.3d at 879). The same four facts considered under Rule 29 may be considered under Rule 33 to resolve the issue of excusable neglect. Boesen, 599 F.3d at 879.

While the same analysis for the Rule 29 motion applies here, for clarity the court will separately consider the factors as relates to the Rule 33 motion. Addressing the first factor, the court finds substantial prejudice to the government will occur if Mr. Gallardo is granted a new trial. A new trial would likely not occur for several more months, already two years post-trial, and witnesses' memories are likely to fade or be challenged because of the time between the acts of sexual abuse and a new trial. Boesen, 599 F.3d at 879.

19

Concerning the second factor, the length of delay, the court finds this factor "cut[s] against granting a motion for a new trial." Id. Mr. Gallardo's motion for new trial was filed 16 months post-verdict. Mr. Gallardo presents no factual or legal justification for the late filing.

Regarding the third factor, the reason for the delay, Mr. Gallardo has no explanation for the delay in filing. Examination of Mr. Gallardo's reasons for seeking a new trial offer no suggestions that the analysis and evidence he presents was somehow difficult to obtain or otherwise not available to him at an earlier time.

As to the fourth factor, as it was in the Rule 29 analysis, the court finds Mr. Gallardo has not acted in good faith. Mr. Gallardo had competent counsel through trial and immediately thereafter when the second attorney was appointed. Present counsel for Mr. Gallardo offers no suggestion as to why the two prior attorneys did not file a timely, or nearly timely, Rule 33 motion. Counsel also fails to provide the court with any explanation as to why he waited four months after becoming Mr. Gallardo's attorney to file the new trial motion. See Dockets 153 and 158.

The court finds the Boesen factors weigh against a finding of excusable neglect. The Rule 33 motion is denied as untimely. Even were the court to find the motion was timely filed, the motion for new trial must be denied in part and reserved in part for the reasons stated below.

The decision to grant or deny a Rule 33 motion "is within the sound discretion of the [district] court." United States v. Campos, 306 F.3d 577, 579 (8th Cir. 2002). The court's discretion is both broad and limited. Id. It is broad to the extent the court "can weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict." Id. (citation and internal quotation marks omitted). Additionally, "the court need not view the evidence most favorably to the verdict." United States v. Worman, 622 F.3d 969, 977 (8th Cir. 2010); United States v. Lacey, 219 F.3d 779, 783-84 (8th Cir. 2000) (In determining whether to grant a Rule 33 motion, "the court need not view the evidence in the light most favorable to the government, but may instead weigh the evidence and evaluate for itself the credibility of the witnesses."). The court's discretion is limited to the extent the court must allow the jury's verdict to stand unless it determines a miscarriage of justice will occur. Id.; see also United States v. McCraney, 612 F.3d 1057, 1064 (8th Cir. 2010) ("Where a defendant moves for a new trial on the grounds that the verdict is contrary to the weight of the evidence, the district court should grant the motion if the evidence weighs heavily enough against the verdict that a miscarriage of justice may have occurred.") (citation and internal quotation marks omitted); Worman, 622 F.3d at 978 ("A district court will upset a jury's finding only if it ultimately determines that a miscarriage of justice will occur."); United States v. Camacho, 555 F.3d 695, 705 (8th Cir. 2009) ("[A] new trial motion based on insufficiency of the evidence is to be granted only if the weight of the evidence is heavy enough in favor of

acquittal that a guilty verdict may have been a miscarriage of justice."). Because a motion for new trial based on the weight of the evidence is "generally disfavored," the district court should use its authority to grant a Rule 33 motion "sparingly and with caution."   <u>Campos</u>, 306 F.3d at 579 (citations and internal quotation marks omitted).

Mr. Gallardo seeks a new trial on 13 grounds.   Those are:

(1)   Insufficiency of the evidence to support a conviction;

(2)   A.B. was never examined by a physician;

(3)   Defendant's desire to testify was overruled by trial counsel;

(4)   Pictures of the interior of the tractor were not introduced at trial;

(5)   Prior text messages and e-mails from Ms. Thunder Hawk were not introduced at trial;

(6)   Shelly [sic] Neprud and Jeremy Glassgo [sic] were not called to testify for the defendant;

(7)   Two prior interviews of Ms. Thunder Hawk were not provided to defendant's trial counsel which would have impeached the witness;

(8)   Mr. Gallardo's signature was forged to a waiver of speedy trial;

(9)   Mr. Gallardo was not present at an arraignment on August 24, 2016;

(10)   A juror should have been replaced during deliberations;

(11)   A juror was present in a restroom reserved for defendant's witnesses;

(12)   Defendant's Indian status is uncertain; and

(13)    Trial counsel failed to present testimony of an expert witness
to counter the testimony of Ms. Tonkel.

(Docket 177).

Several of defendant's grounds for his motion for new trial can be summarily denied as bordering on frivolous or groundless.   Those are:

## A.B. WAS NEVER EXAMINED BY A PHYSICIAN

Mr. Gallardo argues "[t]he absence of any medical testimony supports defendant's position that there was insufficient evidence upon which to submit his case to a jury."  (Docket 188 at p. 5).   Because of the nature of the physical contact–over clothing–nothing would have been achieved by requiring A.B. to be examined by a physician.

## PICTURES OF THE INTERIOR OF THE TRACTOR WERE NOT INTRODUCED AT TRIAL

Mr. Gallardo claims photographs of the interior of the tractor should have been presented to the jury at trial.   He claims "[t]he pictures would have shown that there was only one seat in the cab and there was insufficient room for the victim to [sit] on the lap of the defendant, where it is alleged the unlawful touching occurred."   (Docket 177 ¶ 2).

Photographs were not required to show the cramped quarters inside the cab of the tractor.   A.B. testified about the configuration of the cab and how the offense occurred.   (Docket 164 at p. 33:2-17).   A.B. was cross-examined about the circumstances of this incident.   Id. at pp. 42:1-20.   Photographs of

the interior of the cab would not have impacted the jury's verdicts or resulted

in a judgment of acquittal.   Campos, 306 F.3d at 579.

## TWO PRIOR INTERVIEWS OF MS. THUNDER HAWK WERE NOT PROVIDED TO DEFENDANT'S TRIAL COUNSEL WHICH WOULD HAVE IMPEACHED THE WITNESS

Mr. Gallardo makes a generalized declaration that he overheard the

prosecutor tell his trial counsel about two interviews with Ms. Thunder Hawk

at the College Center.   (Docket 179 ¶ 7).   He claims reports of these

statements were never produced to his trial attorney.   Id.   The government's

response specifically identifies three interviews of Ms. Thunder Hawk which

were produced in advance of trial.   (Docket 187 at p. 17) (referencing bates

stamped documents 35-37, 62, 63 and 229-30).   Mr. Gallardo's reply brief

claims that just because the government said it produced the reports "does not

make it so."   (Docket 188 at p. 7).   The court finds on this record the

government complied with its obligation to produce the reports to the

defendant in advance of trial.

## MR. GALLARDO WAS NOT PRESENT FOR ARRAIGNMENT ON AUGUST 24, 2016

The defendant claims to have "no recollection of being present at the

arraignment on the superseding indictment that occurred on August 24, 2016."

(Docket 179 ¶ 9).   He submits the Clerk's Minutes of the hearing on that date

do "not show my appearance on that date."   Id. (referencing Docket 86).   Mr.

Gallardo's claim is without merit.   The Clerk's Minutes of the arraignment on

the superseding indictment before Magistrate Judge Wollmann on August 24, 2016, specifically notes "[t]he defendant is present in custody." (Docket 86 at p. 1). The official record of the court's proceedings carries far greater weight than the defendant's vague recollection.

Other grounds asserted by Mr. Gallardo for a new trial are separately addressed in the order deemed most appropriate by the court.

<u>A JUROR WAS PRESENT IN A RESTROOM RESERVED FOR DEFENDANT'S WITNESSES</u>

Mr. Gallardo claims he is entitled to a new trial because "[a] female juror was in the bathroom reserved for defendant's witnesses at the same time as defendant's counsel, investigator, jury consultant, and another attorney were discussing the case in the witness room." (Docket 177 ¶ 11). He contends "[a]lthough the juror indicated she heard nothing that was being discussed, that explanation seems unreasonable in light of the proximity of the bathroom to where the conversations took place." <u>Id.</u> Mr. Gallardo argues the court should have excused the juror for cause. <u>Id.</u>

During *voir dire*, the court learned from defense counsel that when she went into the witness room reserved for her and the defense team she observed a prospective juror come out of the bathroom. (Docket 167 at p. 72:16-24). She contended that from the bathroom the prospective witness would have heard the defense team talking about another prospective juror. <u>Id.</u> at p. 73:1-3.

Based on that disclosure, the court conducted an in-chambers examination of Juror #1 with counsel outside the presence of the other jurors.[5] During that colloquy, Juror #1 admitted using the witness room bathroom but denied hearing anything about the case or hearing anyone discussing the case. Id. at p. 74:21-24. After Juror #1 was released from the in-chambers hearing, neither the government nor defense counsel had any further record to make on the matter. Id. at p. 75:10-16. After the exercise of challenges for cause and preemptory challenges, Juror #1 was selected as a juror to hear the case. Id. at p. 87:20-23; see also id. at p. 88:9-11.

Mr. Gallardo has not identified any prejudice which he suffered as a result of the court's colloquy or his trial counsel's decision to allow Juror #1 to remain on the jury. United States v. Robinson, 645 F.2d 616, 617 (8th Cir. 1981) (per curiam) (the defendant bears the burden of "affirmatively demonstrating prejudice" by juror being exposed to a matter outside the courtroom). The court's jury instructions cautioning the jury that the defendant is presumed innocent unless and until proven guilty beyond a reasonable doubt minimize any potential prejudice arising from the circumstances described in this case. Id.; see also Docket 96 at pp. 10-11.

The court finds this matter does not support a motion for new trial.

---

[5]To protect the identity of the prospective juror, the court assigns her a numerical designation.

<u>A JUROR SHOULD HAVE BEEN REPLACED DURING DELIBERATIONS</u>

The court received a note from a juror during deliberations asking "that the alternate take the juror's place in deliberations." (Docket 99). The court held an on-the-record conference with counsel outside the presence of the jury. (Docket 165 at pp. 73-76). After considering the arguments of counsel, the court's written response was: "The alternate juror has been discharged from any duties in connection with the case. Under the law, he cannot participate in deliberations." (Docket 99). Contrary to Mr. Gallardo's argument, the court's response did not include a statement that the jury "must reach a unanimous verdict." <u>Compare</u>, Docket 177 ¶ 10 and Docket 99.

The court's supplemental instructions given a short time prior to the juror's note reminded each juror that "if, in your individual judgment, the evidence fails to establish Mr. Gallardo's guilt beyond a reasonable doubt on an offense charged against him, then Mr. Gallardo should have your vote for a not guilty verdict on that offense." (Docket 97 at p. 3). The jury was further instructed that they could "conduct your deliberations as you choose. You may take all the time you feel is necessary." <u>Id.</u> at p. 4. The court again reminded the jury of the latitude they possessed immediately before directing them to retire for deliberations. "It's entirely up to you the length of time you choose to spend on jury deliberations." (Docket 165 at p. 72:11-12).

Mr. Gallardo provides the court with no authority which mandates removal of the juror, that a mistrial should have been granted or that the

court's response to the juror's inquiry was inappropriate.   The court finds this claim does not support a motion for new trial.

## PRIOR TEXT MESSAGES AND E-MAILS FROM MS. THUNDER HAWK WERE NOT INTRODUCED AT TRIAL[6]

Mr. Gallardo attached to his affidavit a series of e-mail exchanges between Ms. Thunder Hawk and him during the fall of 2014.   (Docket 179-1 at pp. 2-5).   Nowhere in these exchanges does Ms. Thunder Hawk admit she lied to law enforcement about the defendant's sexual abuse of A.B.   Id. Detrimental to the defendant, these communications show Mr. Gallardo's aggressive and bullying nature toward Ms. Thunder Hawk.   Ms. Thunder Hawk was cross-examined during trial about her relationship with Mr. Gallardo and the impact the relationship may have had on her testimony.   The court finds these text messages and e-mails would not have produced an acquittal.   Campos, 306 F.3d at 579.

## SHELLEY GLASGOW AND JEREMY GLASGOW WERE NOT CALLED TO TESTIFY FOR THE DEFENDANT

Mr. Gallardo claims these witnesses would have testified Ms. Thunder Hawk told them she intended to frame Mr. Gallardo for the offenses on trial. (Docket 177 ¶ 6) (referencing Docket 179 ¶ 6).   Mr. Gallardo called two

---

[6]It is unclear whether Mr. Gallardo claims this information is "newly discovered evidence" under Rule 33(b).   The court concludes it does not constitute newly discovered evidence as it was information known to Mr. Gallardo in advance of trial.   United States v. Luna, 94 F.3d 1156, 1161 (8th Cir. 1996) (the defendant was an "active party" to the event in question).

witnesses at trial purporting to present this same defense theory: Vanessa Swallow and Barbara Neiswander. Whether the additional witnesses would have been cumulative need not be resolved at this juncture, but the court finds this potential evidence, like the testimony of Ms. Swallow and Ms. Neiswander, would have not been given sufficient weight by the jury to result in an acquittal. Judging the credibility of the two witnesses who testified, the court finds their testimony was not fully credible and did not undermine the testimony of A.B. <u>Campos</u>, 306 F.3d at 579.

<u>DEFENDANT'S INDIAN STATUS IS UNCERTAIN</u>

Mr. Gallardo claims the court "neglected to submit defendant's Indian status to the jury." (Docket 177 ¶ 12) (referencing <u>United States v. A.W.L.</u>, 117 F.3d 1423 (8th Cir. 1997) (unpublished) and <u>United States v. Bruce</u>, 394 F.3d 1215 (9th Cir. 2005).

Mr. Gallardo was indicted under 18 U.S.C. § 1152. (Docket 82). The government proved A.B. was a Native American child and that the area where the offenses occurred was in Indian country. (Docket 165 at pp. 2:7-6:3 and 6:17-10:7). Mr. Gallardo argues he "is an Indian and should have been charged under [18 U.S.C. §] 1153, not [18 U.S.C. §] 1152." (Docket 188 ¶ 11). Mr. Gallardo argues the indictment was defective and deprived the court of jurisdiction over him for the charged offenses. (Docket 177 ¶ 12).

This claim is without merit. "Contrary to Mr. [Gallardo's] argument, the fact, if it is one, that Mr. [Gallardo] is an Indian would not deprive the district

court of jurisdiction to try him for a violation of § 1152." United States v.
White Horse, 316 F.3d 769, 772 (8th Cir. 2003). His status "might have been
a relevant matter at trial, but the trial court had the power to try the case
whatever Mr. [Gallardo's] status was." Id. "Mr. [Gallardo's] assertion that he
is an Indian is relevant to the matter of proof but irrelevant to the matter of
jurisdiction." Id.

Mr. Gallardo did not raise his Indian status at trial. "If non-Indian
status is an element of the offense of § 1152, [the court] would proceed to
analyze Mr. [Gallardo's] conviction under §§ [2244(a)(5)] and 1152 for plain
error, and [the court] would notice an error not raised at trial only if it is plain,
'affect[s] substantial rights [and] seriously affect[s] the fairness, integrity, or
public reputation of judicial proceedings.' " Id. (citing United States v. Cotton,
535 U.S. 625, 632 (2002) (internal quotations omitted). "If, however, Indian
status is an affirmative defense to a charge under § 1152, Mr. [Gallardo] cannot
prevail because he did not raise the defense in the trial court." Id. (referencing
Clark v. Martinez, 295 F.3d 809, 815 (8th Cir. 2002)).

"[R]egardless of which statute applied (one of them certainly did) Mr.
[Gallardo] was guilty of a federal crime because he, like everyone else, is either
an Indian or he is not." Id. at 773. "Between them, the statutes apply to all
defendants whatever their race or ethnicity. In other words, we believe that
the situation here is the same as it would be if we were dealing not with two
statutes but with a single one that provided that it applied whether or not the

defendant was an Indian." Id. "Furthermore, Mr. [Gallardo] has not indicated that his strategy at trial would have changed if he had been charged under § 1153. Because he has suffered no prejudice from the fact that he might have been charged and convicted under the wrong statutory section, he cannot be entitled to plain error relief." Id.

The court finds Mr. Gallardo is not entitled to a new trial on this ground.

## TRIAL COUNSEL FAILED TO PRESENT TESTIMONY OF AN EXPERT WITNESS TO COUNTER THE TESTIMONY OF MS. TONKEL

Mr. Gallardo essentially asserts this as a claim of ineffective assistance of counsel. "Normally, a collateral postconviction action under 28 U.S.C. § 2255 is the appropriate means for raising a claim of ineffective assistance of counsel and for developing a record sufficient to examine counsel's performance." United States v. Villalpando, 259 F.3d 934, 938 (8th Cir. 2001) (referencing United States v. Jackson, 204 F.3d 812, 815 (8th Cir. 2000)). "The district court, however, may consider the claim on a motion for new trial if it has developed an adequate record on the issue." Id. (referencing United States v. Stevens, 149 F.3d 747, 748 (8th Cir. 1998)).

Other than a general assertion that trial counsel should have presented an expert witness of her own in Mr. Gallardo's defense, counsel provides no detailed explanation as to how a defense expert would have assisted the defendant at trial. No expert is identified as a critical defense witness not called by trial counsel. The court observed trial counsel's cross-examination

31

of Ms. Tonkel and finds it was an adequate approach to deal with A.B.'s prior sexual abuse issues and the child's explanation of what occurred with Mr. Gallardo. On the present record, the court finds Mr. Gallardo was assisted by effective counsel at trial on this issue. <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984) (the defendant must show trial counsel's performance fell below an objective standard of reasonable competence and the deficient performance prejudiced the defendant). Defendant's motion for a new trial on this basis is denied.

<u>DEFENDANT'S DESIRE TO TESTIFY WAS OVERRULED BY TRIAL COUNSEL</u>

Mr. Gallardo asserts in his affidavit in support of the new trial motion that he "wanted to testify at the trial to deny the allegations of sexual abuse made against me by the victim. I was not allowed to do so by my trial counsel." (Docket 179 ¶ 3).

During the defendant's presentation of evidence at trial, Mr. Gallardo's trial attorney asked for a brief recess so she could "confirm the discussion [she] had with [Mr. Gallardo] regarding whether he will testify or not . . . ." (Docket 165 at p. 32:20-21). Following the break, counsel advised the court Mr. Gallardo was not going to testify. "I don't know the Court's protocol on this issue, if the Court would want a record on the colloquy with my client, or if him not testifying, if that is what his decision is, is good enough?" <u>Id.</u> at p. 33:6-10. In the presence of Mr. Gallardo, the court stated "I don't involve myself with colloquy about that decision. That is a decision that belongs to Mr.

Gallardo alone.   You can advise him."   <u>Id.</u> at p. 33:11-13.   The court took

another recess, after which in the presence of the jury Mr. Gallardo's attorney

announced that the defense rested.   <u>Id.</u> at p. 33:18-21.

"A criminal defendant has a constitutional right to testify in his . . . own

defense."   <u>Frey v. Schuetzle</u>, 151 F.3d 893, 897 (8th Cir. 1998) (referencing

<u>Rock v. Arkansas</u>, 483 U.S. 44, 49 (1987); <u>United States v. Bernloehr</u>, 833 F.2d

749, 751 (8th Cir. 1987)).   The court has "previously held that a knowing and

voluntary waiver of the right may be found based on a defendant's silence when

his counsel rests without calling him to testify."   <u>Id.</u> (referencing <u>Bernloehr</u>,

833 F.2d at 751–52).   "[U]nder such circumstances the defendant must act

'affirmatively' rather than apparently 'acquiesc[ing] in his counsel's advice that

he not testify, and then later claim[ing] that his will to testify was overcome.' "

<u>Id.</u> (citing <u>Bernloehr</u>, 833 F.2d at 752) (internal quotation omitted).

Throughout the course of trial there was never any appearance of a

conflict between trial counsel and Mr. Gallardo.   Numerous times during trial

Mr. Gallardo spoke privately with his attorney and the court observed on at

least one occasion he passed a note to her.

The court made clear in Mr. Gallardo's presence that the decision to

testify at trial was his decision and his alone.   Neither during the on-record

discussion with trial counsel, nor when she announced to the jury that the

defendant rested his case did Mr. Gallardo ask to speak with his attorney or

the court about his decision not to testify at trial.

33

The court finds that a motion for a new trial is not the proper stage to resolve Mr. Gallardo's claim.   If the defendant wishes to pursue this claim, he may do so in his direct appeal or through a motion pursuant to 28 U.S.C. § 2255.

## MR. GALLARDO'S SIGNATURE WAS FORGED TO A WAIVER OF SPEEDY TRIAL

Mr. Gallardo claims his signature was forged on a waiver of speedy trial dated December 11, 2015.   (Docket 177 ¶ 8) (referencing Docket177-1; <u>see also</u> Dockets 21 & 22).[7]   Defendant argues this forgery is material to his case because expiration of the Speedy Trial Act, 18 U.S.C. § 3161, was a challenge made before trial commenced.   <u>Id.</u> (referencing Dockets 51 & 52).

On February 20, 2018, Mr. Gallardo filed an opinion report of Curt Baggett.   (Docket 182-1).   In the report, Mr. Baggett compared the waiver of speedy trial document with "sixteen (16) known signatures of Frank Thunder Hawk Gallardo."   <u>Id.</u> at p. 1.   It is Mr. Baggett's "professional expert opinion that a different person authored the name of Frank Thunder Hawk on the questioned document.   Someone did indeed forge the signature of Frank Thunder Hawk on the questioned document . . . ."   <u>Id.</u> at p. 2.

On March 2, 2018, the court directed Attorney Patterson to provide the government with "an affidavit with regard to the defendant's allegation of

---

[7]All further references to the waiver of speedy trial document will be to the original filing.   (Docket 21).

forgery pertaining to the December 11, 2015, waiver of speed trial." (Docket 186). On March 6, 2018, Attorney Patterson executed an affidavit in compliance with the court's order. (Docket 187-2). In her affidavit, Attorney Patterson states:

> On December 11, 2015, I visited . . . Frank Gallardo, at the Pennington County Jail. . . . During that jail visit, I discussed the Speedy Trial Act with my client, and the Waiver of the Speedy Trial Act. . . . Frank Gallardo signed the Waiver of the Speedy Trial Act . . . I then went back to my office and filed the Waiver of the Speedy Trial Act electronically, through [CM/ECF].

Id.

The government resists defendant's motion for new trial on this ground. (Docket 187 at p. 18). The government argues "this is not an appropriate issue at this stage because it [the alleged forgery] has nothing to do with sufficiency of the trial evidence." Id. The government contends the allegation of forgery "is also factually incorrect." Id. It submits "[e]ven a non-expert can see the signatures [from documents attached to the government's brief] are the same and do not resemble those provided by the expert." Id. (referencing Docket 187-1).

Whether the waiver document is a forgery is not relevant to resolution of Mr. Gallardo's motion for a new trial. The waiver accompanied a motion to continue the trial date filed by Attorney Patterson. (Docket 21). In the motion, trial counsel asserted the trial, then scheduled for January 26, 2016,[8]

---

[8]In the motion, counsel indicated the trial was scheduled for "January 26, 2015," but this was clearly a typographical error as the motion was filed on December 11, 2015. See Dockets 19 & 22.

should be continued because counsel needed "additional time to locate witnesses to complete the investigation in this matter and to prepare for trial." Id. ¶ 3.

Separate and apart from the waiver document, Attorney Patterson made an appropriate motion for continuance of the trial date on proper grounds. See id. Had the court denied counsel's motion for a continuance, that ruling would have invited a post-trial challenge for denying the defendant his Sixth Amendment right to a fair trial.

Attorney Patterson is an officer of the court. She submitted a sworn affidavit that Mr. Gallardo signed the Speedy Trial waiver in her presence. If Mr. Gallardo wishes to pursue the forgery claim, he may do so through a motion filed pursuant to 28 U.S.C. § 2255.

INSUFFICIENCY OF THE EVIDENCE TO SUPPORT A CONVICTION

As stated earlier in this order, "[w]here a defendant moves for a new trial on the grounds that the verdict is contrary to the weight of the evidence, the district court should grant the motion if the evidence weighs heavily enough against the verdict that a miscarriage of justice may have occurred." McCraney, 612 F.3d at 1064. "[A] new trial motion based on insufficiency of the evidence is to be granted only if the weight of the evidence is heavy enough in favor of acquittal that a guilty verdict may have been a miscarriage of justice." Camacho, 555 F.3d at 705. The court's discretion is limited to the extent the court must allow the jury's verdict to stand unless it determines a miscarriage of justice will occur. Lacey, 219 F.3d 783-84.

Having presided over the trial and watched the presentation of the evidence very carefully, the court finds A.B. was a highly credible witness. The tragic earlier sexual abuse which A.B. described to Ms. Tonkel and which resulted in a guilty plea by that offender, provided a background experience by which A.B. could, and did, recognize that Mr. Gallardo's conduct was neither inadvertent nor unintentional. A.B.'s testimony about Mr. Gallardo's conduct, supported by the testimony of Ms. Tonkel in accordance with Fed. R. Evid. 807, provided evidence beyond a reasonable doubt to support defendant's convictions on both counts of the superseding indictment. The court finds there is no miscarriage of justice by allowing the jury verdict to stand. Lacey, 219 F.3d at 783-84.

Defendant's motion for a new trial on this basis is denied.

## ORDER

Based on the above analysis, it is

ORDERED that defendant's motion for a judgment of acquittal (Docket 158) is denied.

IT IS FURTHER ORDERED that defendant's amended motion for a new trial (Docket 177) is denied.

Dated October 17, 2018.

BY THE COURT:

/s/ *Jeffrey L. Viken*

JEFFREY L. VIKEN
CHIEF JUDGE